IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NICHOLE ALEXANDRA
INTRIAGO-SEDGWICK

       Petitioner,

v.                                         No. 1:25-cv-01065-MIS-LF

KRISTI NOEM, in her official capacity
as Secretary of the Department of
Homeland Security; PAMELA BONDI,
in her official capacity as Attorney General
of the United States; WARDEN DORA
CASTRO, in her official capacity as
Warden of the Otero County Processing
Center; MARY DE ANDA-YBARRA, in
her official capacity as Field Office
Director of the El Paso Field Office of U.S.
Immigration and Customs Enforcement,
Enforcement and Removal Operations; and
TODD LYONS, in his official capacity as
Acting Director and Senior Official
Performing the Duties of the Director of
U.S. Immigration and Customs
Enforcement,

       Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on a Verified Petition for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2241 (Doc. 1). United States District Judge Margaret Strickland referred

this case to me under 28 U.S.C. §§ 636(b)(1)(B), (b)(3), and *Va. Beach Fed. Sav. & Loan Ass'n v.

Wood*, 901 F.2d 849 (10th Cir. 1990) "to conduct hearings, if warranted, including evidentiary

hearings, and to perform any legal analysis required to recommend to the Court an ultimate

disposition of the case." Doc. 3 at 1. Having reviewed the briefings and the law, I recommend

that the Court grant the petition and order that Petitioner be released immediately. I further

recommend that the Court prohibit Respondents from re-detaining Petitioner absent a pre-detention hearing at which the government bears the burden of proving by clear and convincing evidence that Petitioner is a flight risk or danger to the community. I also recommend that the Court prohibit Respondents from transferring Petitioner outside of the District of New Mexico, including removal from the United States, during the pendency of this action.

## BACKGROUND

### I. Factual Background

Petitioner Nicole Intriago-Sedgwick, a national and citizen of Ecuador, first entered the United States over twenty-three years ago on June 16, 2002, as a nonimmigrant tourist visitor for pleasure authorized to remain in the country until December 15, 2002. Doc. 1 ¶¶ 15, 24; Doc. 15 at 2. Petitioner was a minor at the time. *See* Doc. 1-2 at 2; Doc. 15 at 2. Petitioner remained in the country past December 15, 2002, but on October 22, 2012, she applied for Deferred Action for Childhood Arrivals ("DACA") with U.S. Citizenship and Immigration Services ("USCIS"); USCIS approved her DACA status on May 1, 2013. Doc. 1 ¶ 25; Doc. 15 at 3. Petitioner continuously renewed her DACA status every two years, with her most recent renewal on January 26, 2024. Doc. 1 ¶ 26; Doc. 1-2 at 3–5. Petitioner only left the country once more than ten years ago to visit her ill grandfather, but she was granted advanced humanitarian parole and allowed to reenter the U.S. lawfully on August 26, 2015. *Id.* ¶ 27; Doc. 15 at 3.

Petitioner has attempted to adjust her status to that of a Lawful Permanent Resident. On July 3, 2017, Petitioner's mother, as a Lawful Permanent Resident,[1] filed a Petition for Alien Relative that was approved on April 8, 2021. Doc. 1 ¶ 28. However, no further action was taken

---

[1] It appears that this petition was filed when Petitioner's mother was a Lawful Permanent Resident, but she has since become a citizen. *See* Doc. 1 ¶ 6.

on the petition.  *Id.*  On July 26, 2024, Petitioner married a U.S. citizen, and Petitioner's husband also filed a Petition for Alien Relative along with an Application to Register Permanent Residence or Adjust Status on March 19, 2025.  *Id.* ¶¶ 29–30.

While residing in the U.S., Petitioner became the mother and primary provider to three U.S.-citizen children.  *Id.* ¶ 31.  The children's father is Petitioner's ex-boyfriend, Mr. Parraga; Petitioner's two daughters live with her while Petitioner's son lives with Mr. Parraga.  *Id.* ¶ 32. Petitioner makes child support payments for her son, while Mr. Parraga owes more than $30,000 in child support payments for his daughters.  *Id.*  Petitioner and Mr. Parraga had mutual temporary restraining orders against each other in 2025.  *Id.* ¶ 36.

On June 3, 2025, the Hackensack Police Department in New Jersey arrested Petitioner for criminal contempt related to violations of the temporary restraining order against her, after both Petitioner and Mr. Parraga alleged that the other had violated their respective restraining orders. *Id.*  On June 4, 2025, while Petitioner was in custody at the Bergen County Jail in New Jersey, U.S. Immigration and Customs Enforcement ("ICE") lodged an immigration detainer against her with the jail.  *Id.* ¶ 39; Doc. 15 at 3.  ICE additionally issued Petitioner a Warrant of Arrest and Notice to Appear for removal proceedings on June 4, 2025, charging her under Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA") as an immigrant who, at the time of application for admission, did not possess a valid entry document.  Doc. 15 at 3.  ICE took Petitioner into custody on June 4th or 5th, 2025.[2]  On July 15, 2025, ICE withdrew the initial charge, and instead charged her under Section 237(a)(1)(B) alleging that she, as a non-immigrant, remained in the U.S. longer than permitted.  Doc. 15 at 4.  On September 25, 2025,

---

[2] The petition states that ICE took Petitioner into custody on June 4, Doc. 1 ¶ 39, while Respondents and a sworn declarant state that Petitioner was taken into custody on June 5, Doc. 15 at 3; Doc. 15-1 ¶ 15.

ICE again changed course and charged Petitioner as removable pursuant to Section 212(a)(7)(A)(i)(I) of the INA, this time citing Petitioner's reentry into the country on August 26, 2015, without a valid entry document. *Id.*; Doc. 15-1 ¶ 19; Doc. 15-4.

On June 4, 2025, ICE requested that USCIS terminate Petitioner's DACA status. Doc. 1 ¶ 48. Respondents contend that USCIS then notified Petitioner of its intent to terminate her DACA status on June 17, 2025, and that USCIS terminated Petitioner's DACA status on September 9, 2025, because she failed to respond to the notice of intent to terminate ("NOIT"). Doc. 15 at 4; Doc. 15-3 at 1. Petitioner asserts that she was not able to adequately respond to the NOIT because she was in ICE custody and was moved multiple times. Doc. 16 at 8. Neither Petitioner nor Respondents submitted the NOIT to the Court, but the notice of termination that USCIS sent to Petitioner is addressed to Petitioner at her home address even though Petitioner was in ICE custody when it was issued. *See* Doc. 15-3 at 1. On August 25, 2025, USCIS also sent Petitioner notice that her application to adjust status was administratively closed because she was in ICE custody. Doc. 1-6 at 2–3.

The state criminal charge on which Petitioner was arrested was dismissed, and an expedited expungement of the charges was granted on August 13, 2025. Doc. 1 ¶ 36. Petitioner remains in ICE custody despite the state criminal charge's dismissal and expungement. *Id.* ¶¶ 36, 39. On September 26, 2025, Petitioner appeared for a custody redetermination hearing before an immigration judge ("IJ"), where the IJ found that the immigration court lacked jurisdiction to conduct a bond because of Petitioner's charge as an "arriving alien" subject to mandatory detention. *Id.* ¶ 22; Doc. 1-3 at 8–9; Doc. 15 at 4.

Petitioner asserts that her continued detention has had serious consequences for her children's financial stability and health. Doc. 1 ¶¶ 32–33. Petitioner's two daughters lived with

Petitioner prior to her detention, and their father owes over $30,000 in child support arrears. *Id.*
¶ 32. Petitioner's son lives with his father, but Petitioner provides child support payments for his
care. *Id.* Additionally, Petitioner's daughters suffer from severe mental health issues, and
Petitioner's detainment has resulted in treatment being discontinued for one of her daughters. *Id.*
¶ 33.

Petitioner has strong ties to the community. *Id.* ¶ 41. She has resided in the United States
for over two decades and has three U.S.-citizen children that she provides for. *Id.* ¶¶ 15, 32–33.
Petitioner's mother is a U.S. citizen; Petitioner is married to a U.S. citizen, and she has three
U.S.-citizen siblings. *Id.* ¶¶ 6, 28–29. Petitioner has made great efforts to establish a lawful
presence in the country, as exemplified by her continuous DACA renewals and her attempts to
adjust her status. *Id.* ¶¶ 25–26, 28, 30. Additionally, she has worked in supervisory roles since
2015 and maintains the licenses and certifications necessary for that employment. *Id.* ¶¶ 34–35.

Petitioner also asserts that she is not a danger to the community. As described above, the
criminal charge that led to her current detainment was dismissed and expunged. *Id.* ¶ 36.
Petitioner states that she was also charged under N.J. STAT. ANN. § 2C:20-6 (theft of property
lost, mislaid, or delivered by mistake) and N.J. STAT. ANN. § 2C:20-7A (receiving stolen property
valued less than $200) on March 14, 2024. *Id.* ¶ 37. However, on April 24, 2025, these charges
also were dismissed and expunged from her record. *Id.* Petitioner alleges that the criminal
charges were the result of continuous complaints that her ex-boyfriend, Mr. Parraga, lodged
against her in retaliation for ending their relationship. *Id.* ¶ 38.

## II.    Procedural History

Petitioner, through counsel, filed a petition for a writ of habeas corpus pursuant to 28
U.S.C. § 2241 on October 25, 2025, requesting that the Court (1) declare her continued detention

unlawful and order her immediate release from ICE custody, or (2) conduct an immediate, constitutionally adequate individualized custody determination at which the government bears the burden of justifying her continued detention. *Id.* at 24. Petitioner also requests that the Court enjoin her removal from the United States and transfer outside of the District of New Mexico during the pendency of the case, and that the Court award her costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. *Id.*

Dora Castro, warden of the facility where Petition is detained, appeared in this matter on December 3, 2025, to join "the position(s) that the USA Respondents may take related to the Petition and/or other pleadings filed in this matter." Doc. 11 at 1. On December 11, 2025, the federal respondents[3] filed their response to the petition, *see* Doc. 15, and Petitioner filed her Reply on December 14, 2025, *see* Doc. 16.

## ANALYSIS

Petitioner challenges her arrest and detention through numerous claims: violation of Fifth Amendment due process rights, Doc. 1 ¶¶ 53–59, 70–74; violation of the Administrative Procedure Act, *id.* ¶¶ 60–64; violations of the *Accardi* doctrine, *id.* ¶¶ 65–69, 83–85; and violation of the Fourth Amendment and 8 U.S.C. § 1357(a)(2), *id.* ¶¶ 75–82. Petitioner additionally argues that her arrest and detention do not further the federal government's goals, and that the Court has authority to grant her bail. *Id.* ¶¶ 86–94. I will first address the Court's jurisdiction over the petition and briefly clarify Petitioner's DACA status before addressing her claims.

---

[3] Because Warden Castro prospectively joined the federal government respondents' position, Doc. 11 at 1, and because the federal respondents assert that their arguments "apply with equal force to Warden Castro," Doc. 15 at 1, I will refer to the response as Respondents' response throughout.

I.    **The Court has subject matter jurisdiction over the petition, and that jurisdiction will not become moot until an order of removal is administratively final.**

Federal courts possess jurisdiction over a matter only as authorized by the U.S. Constitution and statute.  *Gunn v. Minton*, 568 U.S. 251, 256 (2013).  Section 2241 of title 28, United States Code, grants district courts the authority to grant writs of habeas corpus, and district courts may entertain petitions pursuant to § 2241 that challenge pre-removal immigration detention.  *See, e.g.*, *Ochieng v. Mukasey*, 520 F.3d 1110, 1115 (10th Cir. 2008).  While there currently is no order of removal issued against Petitioner, if one is issued before the Court makes its ruling in this matter, Petitioner's challenge to her pre-removal detention survives until any removal order becomes final.  Section 1231(a)(2)(A) of title 8, United States Code, provides that, after a noncitizen is ordered removed, "[d]uring the removal period, the Attorney General shall detain the alien."  The statute clarifies that the

removal period begins on the latest of the following:

(i)    The date the order of removal becomes administratively final.

(ii)    If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii)    If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).  The Supreme Court has concluded that a removal order is administratively final for purposes of detention "once the [Board of Immigration Appeals ("BIA")] has reviewed the order (or the time for seeking the BIA's review has expired)." *Johnson v. Guzman Chavez*, 594 U.S. 523, 534–35 (2021).  Any challenge to pre-removal detention under 28 U.S.C. §§ 1225, 1226 thus becomes moot when a removal order becomes administratively final, as the authority to detain a petitioner then shifts to 8 U.S.C. § 1231(a)(2). *See Carbajal v. Holder*, 43 F. Supp. 3d 1184, 1188–90 (D. Colo. 2014).

Should Petitioner be ordered removed during the pendency of this action, I recommend that the Court not find the petition moot until Petitioner's time to appeal the removal order has expired, or if Petitioner timely appeals, the BIA issues a decision on that appeal. *See Castillo v. Anda-Ybarra*, No. 25-1074 JB/JFR, 2025 WL 3251223, at *6–7 (D.N.M. Nov. 21, 2025) (magistrate judge recommending the same).

## II.    Petitioner had DACA at the time of her arrest and well after her initial detention.

In 2012, the Department of Homeland Security ("DHS") first announced DACA as a policy to allow certain noncitizens who arrived in the U.S. as children to apply for forbearance from removal. *Dept' of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 8–9 (2020). Those granted DACA status became eligible for work authorization and federal benefits. *Id.* at 9. At the time, the Secretary of Homeland Security noted "that limited enforcement resources should not be expended to remove productive young people to countries where they may not have lived or even speak the language." Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152, 53153 (Aug. 30, 2022) (internal quotations omitted). In 2022, pursuant to "the consistent judgment that has been maintained by [DHS]—and by three presidential administrations since the policy first was announced—that DACA recipients should not be a priority for removal," *id.* at 53155, the policy was codified in the Code of Federal Regulations, *see* 8 C.F.R. §§ 236.21–.25.

Under the regulations, DACA recipients are treated as lawfully present for the period of the deferred action, though DACA "does not confer any right or entitlement to remain in or reenter the United States" and "does not preclude DHS from commencing removal proceedings at any time." 8 C.F.R. § 236.21(c). DACA status is not permanent but rather is subject to renewal every two years. *Id.* § 236.23(a)(4). However, USCIS must follow certain procedures

when it seeks to terminate a recipient's DACA status before expiration.  *Id.* § 236.23(d).

Specifically, USCIS must provide the noncitizen with "a Notice of Intent to Terminate and an

opportunity to respond prior to terminating a grant of [DACA]."[4]  *Id.* § 236.23(d)(1).  A

noncitizen that is in immigration detention may request DACA status but may not be approved

for DACA unless they are released from ICE detention prior to a decision on the DACA request.

*Id* § 236.23(a)(2).

While DACA is a discretionary benefit and not an entitlement, courts have recognized

that DACA recipients gain a property interest in retaining their DACA status that is protected by

due process.  *See Gamez Lira v. Noem*, No. 1:25-cv-00855-WJ-KK, 2025 WL 2581710, at *3

(D.N.M. Sept. 5, 2025); *Santiago v. Noem*, No. EP-25-CV-361-KC, 2025 WL 2792588, at *10–

*11 (W.D. Tex. Oct. 5, 2025); *Inland Empire - Immigrant Youth Collective v. Nielsen*, No. EDCV

17-2048 PSG, 2018 WL 4998230, at *19 (C.D. Cal. Apr. 19, 2018); *Medina v. U.S. Dep't of

Homeland Sec.*, No. C17-0218RSM, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017).

USCIS's own guidance instructs officers that the "termination of a DACA grant must comply

with the Administrative Procedure Act (APA)," and that "USCIS must comply with DACA

regulations" that "require notice and an opportunity to respond before an alien's DACA grant is

terminated."  U.S. Citizenship & Immigr. Servs., Policy Memorandum, 2025 WL 2779169, at *2

(Sept. 26, 2025).  The guidance notes that "[c]ompliance with regulations, by issuing a NOIT and

consistently applying the standards for DACA terminations, bolsters the government's position

that it is not abusing its discretion or acting in an arbitrary or capricious manner."  *Id.*

---

[4] While not relevant here, USCIS may terminate DACA status without a Notice of Intent and opportunity to respond if the noncitizen is convicted of a national security-related offense or egregious public safety offense.  28 C.F.R. § 236.23(d)(1).

The regulatory text provides that DACA "does not confer any right or entitlement to remain in or reenter the United States" and "does not preclude DHS from commencing removal proceedings at any time." 8 C.F.R. § 236.21(c)(1). Respondents accordingly emphasize that DACA is a form of enforcement discretion. Doc. 15 at 5. But courts have disagreed. As the Supreme Court has explained, DACA is not "a passive non-enforcement policy" but rather "a program for conferring affirmative immigration relief" that provides access to benefits that "courts often are called upon to protect." *Regents of Univ. of Cal.*, 591 U.S. at 18–19. And despite the regulation's statement that DHS may commence removal proceedings at any time, the Supreme Court has defined "deferred action" as "the decision to defer removal (and to notify the affected alien of that decision)." *Id.* at 27; *see also Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 484 (1999) ("Approval of deferred action status means that . . . no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.") (quoting 6 C. Gordon, S. Mailman, & S. Yale–Loehr, Immigration Law and Procedure § 72.03[2][h] (1998))).

Courts across the country accordingly have granted recipients of deferred action relief from detainment and removal. *See Enriquez-Perdomo v. Newman*, 54 F.4th 855, 863–64 (6th Cir. 2022) (concluding that a DACA recipient's arrest and detention were unauthorized and their removal order nonexecutable); *Gamez Lira*, 2025 WL 2581710, at *3 (granting a DACA recipient's request for a temporary restraining order enjoining his removal from New Mexico and ordering the government to show cause why the petitioner should not be immediately released); *Santiago*, 2025 WL 2792588, at *14 (noting the government's concession that a removal order is inexecutable against a DACA recipient and granting immediate release from detention); *Sepulveda Ayala v. Bondi*, 794 F. Supp. 3d 901, 912–14 (W.D. Wash. 2025) (concluding that a

petitioner detained despite a grant of deferred action demonstrated a likelihood of success that his detention is unlawful); *F.R.P. v. Wamsley*, No. 3:25-cv-01917-AN, 2025 WL 3037858, at *3, *8 (D. Or. Oct. 30, 2025) (ordering a DACA recipient's immediate release after reasoning that "[l]egal precedent strongly suggests that" the government does not "have free reign to detain a deferred action recipient without a pre-detention hearing or individualized determination"); *Guerrero v. Noem*, No. 1:25-cv-1572, 2025 WL 3520407, at *1, *9 (W.D. Mich. Dec. 9, 2025) (conditionally granting a DACA recipient's habeas petition and ordering the government to provide a bond hearing within five days); *Belsai D.S. v. Bondi*, No. 25-cv-3682 (KMM/EMB), 2025 WL 2802947, at *2, *7 (D. Minn. Oct. 1, 2025) (ordering a bond hearing for a petitioner who was a DACA recipient at the time of arrest).  As the Western District of Texas has explained:

> A core benefit of DACA is that it allows recipients to live, study, and work in the United States without fear of arrest or deportation.  It would be incongruous to find that DACA recipients acquire a constitutionally protected interest in their DACA benefit, but not one of its essential facets: their liberty.

*Santiago*, 2025 WL 2792588, at *10.

There is no dispute that Petitioner was first granted DACA on May 1, 2013, and that she maintained DACA status until at least September 9, 2025.  Doc. 1 ¶¶ 25–26; Doc. 15 at 3.  It is therefore indisputable that Petitioner held valid DACA status on June 4 and 5, 2025, when she was detained by ICE and removal proceedings were initiated against her.  It also does not appear disputed that Petitioner's DACA status was terminated on September 9, 2025, Doc. 15 at 3; Doc. 16 at 8, although the parties do dispute whether the government followed the proper procedures in terminating Petitioner's DACA status.  Respondents argue that Petitioner was appropriately provided a Notice of Intent to Terminate ("NOIT") her DACA status on June 17, 2025, and that her DACA status was summarily terminated on September 9, 2025, after she failed to respond. Doc. 15 at 15; Doc. 15-3 at 1; *see* 8 C.F.R. 236.23(d)(1).  Petitioner disagrees that she was given

a reasonable opportunity to respond as she "was moved multiple times over multiple states while

in ICE custody," and "Respondents played a critical role in ensuring she would be unable to

renew her DACA."  Doc. 16 at 8.  Notably, USCIS's notice to Petitioner that her DACA status

was terminated appears to have been sent to her home address rather than the detention facility

where she was being held, *see* Doc. 15-3 at 1, casting doubt as to whether she actually received

notice of the termination proceedings and had a reasonable opportunity to respond.  But even

assuming that Petitioner's DACA status was validly terminated on September 9, 2025, Petitioner

remained detained and subject to removal proceedings for ninety-seven days while holding

DACA status.

### III.    Petitioner's mandatory detention pursuant to her erroneous classification under the INA violated her Fifth Amendment right to due process.

Petitioner argues that her detention violates her procedural and substantive due process

rights under the Fifth Amendment.  Doc. 1 ¶¶ 53–59, 70–74.  Respondents disagree, arguing that

Petitioner was appropriately subject to mandatory detention under the INA and has been afforded

the required statutory rights and protections.  Doc. 15 at 11–13.

The Fifth Amendment entitles noncitizens to due process of law during removal

proceedings.  *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025).  What due process Petitioner is owed

depends on her classification under the provisions of the INA.  Two relevant statutory provisions

of the INA govern whether an individual is eligible for a bond hearing or is subject to mandatory

detention.  Section 1226(a) of title 8, United States Code, provides that "[o]n a warrant issued by

the Attorney General, an alien may be arrested and detained pending a decision on whether the

alien is to be removed from the United States," and pending such decision, the Attorney General

"may release the alien" on bond or conditional parole.  By contrast, 8 U.S.C. § 1225(b)(2)(A)

provides that "in the case of an alien who is an applicant for admission, if the examining

immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained." Thus, the relevant question here is who can be considered an "applicant for admission" or "seeking admission." 8 U.S.C. § 1225(b)(2)(A). The Supreme Court discussed both statutory sections and the classes of individuals they apply to in *Jennings v. Rodriguez*, 583 U.S. 281 (U.S. 2018). The Court explained that "§ 1225(b) applies primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)." *Id.* at 297. The Court then discussed § 1226, explaining that "§ 1226 applies to aliens already present in the United States." *Id.* at 303. The Court further provided that § "1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings," and also "permits the Attorney General to release those aliens on bond." *Id.*

But Respondents ask the Court to adopt a new interpretation of the INA. Respondents argue that the 1996 amendments made to the INA by the Illegal Reform and Immigration Responsibility Act ("IIRIRA") corrected the INA's previous focus on physical entry and instead made "lawful 'admission' the governing touchstone" of whether a noncitizen is subject to § 1226 or § 1225.[5] Doc. 15 at 6–7. The highest immigration court, the Board of Immigration Appeals ("BIA"), adopted this argument in a recent decision, *Matter of Yajure Hurtado*, holding that noncitizens' physical presence in the U.S. does not change their status as "arriving aliens" or "applicants for admission" subject to mandatory detention under § 1225(b). 29 I. & N. Dec. 216, 228 (BIA 2025). The BIA reasoned that to hold otherwise would reward noncitizens for evading apprehension and punish noncitizens who present themselves at ports of entry. *Id.*

---

[5] Notably, the Supreme Court issued its opinion in *Jennings*—interpreting the same provisions of the INA—in 2018, well after the 1996 amendments.

Courts in this district have joined courts across the country in rejecting *Yajure Hurtado* and finding that § 1226(a) governs the detention of noncitizens apprehended after residing in the United States. *See Pu Sacvin v. De Anda-Ybarra*, No. 2:25-cv-01031-KG-JFR, 2025 WL 3187432, at *2–3 (D.N.M. Nov. 14, 2025) ("Given the overwhelming contrary authority, *Hurtado* represents a minority view that does not control here."); *see also Molina Ochoa v. Noem*, No. 1:25-cv-00881-JB-LF, 2025 WL 3125846, at *7–8 (D.N.M. Nov. 7, 2025) (collecting cases). Further, a growing number of courts are finding that § 1226(a) applies squarely to DACA recipients. *See Velasco Lopez v. Decker*, 978 F.3d 842, 845 (2d Cir. 2020) (stating that "persons subject to detention under § 1226(a) . . . include individuals with no criminal record" and "those who are or were protected by DACA"); *Escobar-Ruiz v. Raycraft*, No. 1:25-cv-1232, 2025 WL 3039255, at *4 (W.D. Mich. Oct. 31, 2025) (reasoning that "an individual who applies for relief under DACA cannot logically be said to be seeking admission" within the context of § 1225(b)(2)(A)); *Belsai D.S.*, 2025 WL 2802947, at *7 (holding that § 1226(a) governed a DACA recipient's detention). Such a conclusion flows naturally from the rule that § 1226(a) applies to noncitizens who are physically present in the country before apprehension: DACA recipients were verified by USCIS to have resided in the United States since 2007. 8 C.F.R. § 236.22(b)(2). And subjecting DACA recipients to mandatory detention under § 1225(b) is contrary even to *Yajure Hurtado*'s flawed logic, as that would punish noncitizens who present themselves to the government through the DACA program rather than continue to evade identification. *Cf.* 29 I. & N. Dec. at 228.

Petitioner has resided continuously in the United States since June 16, 2002, save for a month in 2015 when the government permitted Petitioner to leave the country and return. Doc. 1 ¶¶ 15, 27; Doc. 15 at 3; *see* 8 C.F.R. § 362.22(b)(2) (authorized travel outside of the U.S. after

June 15, 2007, does not interrupt DACA's continuous residence requirement).  The government renewed Petitioner's DACA status five times over the past decade, including four times since she was authorized to reenter the country in 2015, Doc. 1-2 at 3–5, and Petitioner held DACA status at the time of her arrest and for at least several months during her detention, Doc. 15 at 3.  Even disregarding her DACA status, Petitioner falls under § 1226(a) under Respondents' own interpretation of the INA, as they state that § 1226 "is the only provision that governs the detention of noncitizens who, for example, lawfully enter the country but overstay or otherwise violate the terms of their visas."  Doc. 15 at 8.  Petitioner has been charged "based on allegations of Petitioner's overstay on her non-immigrant tourist (B2) visa" in 2002 and after lawfully entering the country through advanced humanitarian parole in 2015.  *Id.* at 4.  Accordingly, I recommend that the Court find that § 1226(a) governs Petitioner's detention rather than § 1225(b).

## IV.    The Court may grant relief solely on the Fifth Amendment violation.

Courts in this district and across the country have found that a successful Fifth Amendment claim alone warrants granting habeas relief under these circumstances.  *See, e.g.*, *Gonzalez Ramos v. Dedos*, No. 1:25-cv-00975-MLG-KRS, 2025 WL 3653928, at *1, *4–*5 (D.N.M. Dec. 17, 2025) (granting a § 2241 petition based solely on violations of Fifth Amendment due process rights related to incorrect classification under § 1225); *Rivera Esperanza v. Francis*, No. 25-CV-8727, 2025 WL 3513983, at *9 n.4 (S.D.N.Y. Dec. 8, 2025) ("Having found that [the petitioner's] rights under the Fifth Amendment were violated when the Government detained him on October 21, 2025, the Court does not reach his alternative arguments that his detention violated the Fourth Amendment or the INA.").  Because Petitioner

has established a Fifth Amendment violation, the Court need not address Petitioner's Fourth

Amendment,[6] *Accardi* doctrine, or APA claims.[7]

### III. Petitioner should be immediately released, and her re-detainment prohibited without a pre-deprivation bond hearing at which the government bears the burden of proving by clear and convincing evidence that she is a flight risk or a danger to the community.

Because Petitioner has demonstrated that she should be classified under § 1226(a) rather

than § 1225(b), she should at the very least be afforded a bond hearing pursuant to § 1226(a).

Courts in this district have ordered the government to provide a petitioner erroneously classified

under § 1225(b) with a bond hearing at which the government bears the burden of proving by

clear and convincing evidence that the petitioner is either a flight risk or a danger to the

community. *See, e.g.*, *Pu Sacvin*, 2025 WL 3187432, at *3; *Gonzalez Ramos*, 2025 WL

3653928, at *5. But several courts have ordered the immediate release of DACA recipients

erroneously classified under § 1225(b). *See Santiago*, 2025 WL 2792588, at *13–*14; *F.R.P.*,

---

[6] It is not clear whether the relief Petitioner seeks can even be granted on the basis of a Fourth Amendment violation. *See Luevano v. Holder*, 660 F.3d 1207, 1213 (10th Cir. 2011) (concluding that the violation of the Fourth Amendment would only entitle a petitioner to suppression of evidence in removal proceedings).

[7] Petitioner's APA claim is dubious. The APA clarifies that judicial review of agency actions is limited to those "made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Courts have found that immigration detention may not be challenged under the APA, both because detention is not a final agency action and because an adequate remedy may be sought through habeas corpus. *See J.G.G.*, 604 U.S. 670, 674 (2025) (Kavanaugh, J., concurring) (agreeing with the majority "that habeas corpus, not the APA, is the proper vehicle" where habeas corpus is an available remedy); *Gamez Lira*, 2025 WL 2581710, at *4 (finding that a petitioner was not likely to succeed on his APA claim because detention is not a final agency action).

This is not to suggest that the APA forecloses all challenges under these facts outside of a habeas corpus proceeding. For example, courts have found challenges to DACA terminations cognizable under the APA. *See Inland Empire-Immigrant Youth Collective*, 2018 WL 4998230, at *18–19; *Medina*, 2017 WL 5176720, at *9. Here, however, Petitioner's APA claim only challenges her detention.

2025 WL 3037858, at *8; *Ayala v. Bondi*, No. 2:25-cv-01063-JNW-TLF, 2025 WL 2209708, at *4–*5 (W.D. Wash. Aug. 4, 2025).

A bond hearing is an appropriate remedy where "the government has at least some articulable, legitimate interest in detaining the petitioner," but immediate release is appropriate where "the government had no or an insignificant interest in detaining the petitioner." *Santiago*, 2025 WL 2792588, at *13. Additionally, noncitizens released by the government into the country acquire a protected liberty interest in remaining out of custody and are entitled to procedural safeguards before being detained. *See Danierov v. Noem*, No. 2:25-cv-01215-KG-KRS, 2025 WL 3653925, at *2 (D.N.M. Dec. 17, 2025); *Santiago*, 2025 WL 2792588, at *11. The Supreme Court's *Mathews v. Eldridge* test provides the appropriate framework when determining what procedural safeguards are due, requiring courts to consider "(1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the probable value of additional safeguard; and (3) the Government's interest, including the fiscal and administrative burdens of additional procedures." *Danierov*, 2025 WL 3653925, at *2 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)) (internal quotations omitted).

A. Private Interest

The private interest in freedom from physical detention is the most elemental of liberty interests. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). Respondents argue that Petitioner has no interest in liberty because she is subject to mandatory detention under § 1225(b). Doc. 15 at 11–12. For the reasons stated previously, § 1226(a) rather than § 1225(b) applies to Petitioner's detention. But even assuming that Respondents are correct, their argument fails to address the liberty interests Petitioner was conferred after her authorization to remain in the country through DACA. *See Gamez Lira*, 2025 WL 2581710, at *3; *Santiago*, 2025 WL 2792588, at *10–*11.

Because Petitioner has spent over two decades in the United States, including over a decade with the government's permission under DACA, Petitioner possesses a cognizable interest in her continued freedom from detention. *See Salazar*, 2025 WL 2792588, at *11.

     B.  <u>Risk of Erroneous Deprivation</u>

There is a significant risk of erroneous deprivation, and indeed significant evidence that such deprivation occurred when Petitioner was arrested and detained while holding valid DACA status. Petitioner was not removable pursuant to her DACA in June 2025 when a warrant was issued for her arrest and she was taken into ICE custody. *See Enriquez-Perdomo*, 54 F.4th at 863–64; *Gamez Lira*, 2025 WL 2581710, at *3–*4. Yet the immigration officer who issued Petitioner's arrest warrant attested that he believed Petitioner was removable after checking Petitioner's federal records, Doc. 15-2 at 1, despite DHS's own records clearly reflecting that Petitioner had DACA status when she was arrested. Doc. 1-2 at 5. Petitioner has languished in Respondents' custody for over six months.

Respondents now attempt to salvage this error by stating that Petitioner's DACA status was terminated several months after her arrest. Doc. 15 at 12. But the circumstances of that termination are suspect, given that the termination notice was sent to Petitioner's home address despite the government's knowledge that she was in its custody, *see* Doc. 15-3, not to mention Petitioner's limited ability to respond to such notice while in custody, Doc. 16 at 8. Even assuming Petitioner's DACA termination is valid, Petitioner still was detained for over three months before that termination. Doc. 15 at 3. Further, Petitioner's DACA status was terminated solely on her alleged failure to respond rather than any articulated change in circumstances. *See* Doc. 15-3.

C.    Government's Interest

Respondents' stated interest in detaining Petitioner appears to be their belief that they are statutorily required to detain Petitioner during removal proceedings under § 1225(b).  Doc. 15 at 11–13.  But as explained previously, Petitioner was erroneously classified under § 1225(b).  While the government has an interest in ensuring noncitizens appear for removal proceedings, that interest "is weak or nonexistent where removal seems a remote possibility at best."  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Petitioner's detention while she was protected from removal through DACA served no valid purpose.  *See Santiago*, 2025 WL 2792588, at *12 (collecting cases concluding that the detention of deferred action recipients serves no legitimate purpose).

Even now, after arguing that Petitioner's DACA was terminated, Respondents offer no reason to believe that Petitioner is a flight risk.  On the contrary, Petitioner has demonstrated very strong ties to the community.  She is the mother and primary provider to three U.S.-citizen children and is married to a U.S. citizen.  Doc. 1 ¶¶ 29–31.  Petitioner's mother is a U.S. citizen.  *Id.* ¶ 6.  Petitioner has been employed for a decade.  *Id.* ¶ 34.  Further, while Petitioner is a not a U.S. citizen, she has taken great lengths to maintain an authorized presence in the country: applying for and continuously renewing her DACA status and applying for advanced humanitarian parole.  *Id.* ¶¶ 25–27.

Similarly, while the government has an interest in detaining noncitizens who are a danger to the community, *Zadvydas*, 533 U.S. at 690–91, Respondents have offered nothing to suggest that Petitioner is a danger.  All evidence is to the contrary.  Petitioner has no criminal history.  Doc. 1 ¶ 40 (noting all criminal charges against Petitioner in New Jersey were dismissed and expunged); N.J. STAT. ANN. § 2C:52-27 ("[I]f an order of expungement is granted, the arrest,

conviction and any proceedings related thereto shall be deemed not to have occurred."). The government appeared to agree that she posed no danger when it renewed her DACA five times over the last decade. *See* Doc. 1-2 at 3–5; *Santiago*, 2025 WL 2792588, at *13 (noting that DACA recipients are required to submit to comprehensive background and security checks). The only circumstance that appears to have changed since Petitioner's most recent DACA renewal in 2024 is the government's new, near-universally rejected interpretation of the INA. *See Santiago*, 2025 WL 2792588, at * 13 (noting "that there has not been any change in [the petitioner's] circumstances since she was last renewed for DACA, such as might indicate that she has become a flight risk or a danger to the community").

Without a legitimate interest justifying Petitioner's detention, immediate release is the most appropriate remedy to redress Respondents' violation of her due process rights. *See Santiago*, 2025 WL 2792588, at *14. Respondents argue that immediate release is not an available remedy. Doc. 15 at 13–14. But "the traditional function of the writ is to secure release from illegal custody," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), and courts have accordingly ordered the release of noncitizens whose detention was found to serve little or no legitimate purpose, *see Santiago*, 2025 WL 2792588, at *13 (collecting cases).

To be clear, while immediate release is the most appropriate remedy available, it will not fully address the harm that Respondents have inflicted on Petitioner and her family. It will not give Petitioner back the months away from her U.S.-citizen children, nor will it replace the emotional and financial support Petitioner could have provided them during that time as their primary provider. It will not reopen the application for adjustment of status that was administratively closed because of her detention. Nor will her immediate release restore the limited taxpayer resources wasted keeping her unlawfully detained. *See* Deferred Action for

Childhood Arrivals, 87 Fed. Reg. 53152, 53155 (Aug. 30, 2022) (noting that "enforcement resources are limited" and "that DACA supports [DHS]'s efforts to more efficiently allocate enforcement resources").  But her immediate release can prevent further harm.  I accordingly recommend that the Court order that Petitioner be immediately released and that Respondents be ordered to file written notice informing the Court of Petitioner's release.

Further, I recommend that the Court order that Respondents are prohibited from re-detaining Petitioner without a pre-detainment hearing before an Immigration Judge at which the government bears the burden of proving by clear and convincing evidence changed circumstances rendering Petitioner a flight risk or danger.  *See Hernandez-Parrilla v. Anda-Ybarra*, No. 2:25-cv-01224-MIS-KK, 2025 WL 3632769, at *7 (D.N.M. Dec. 15, 2025) (ordering same).  This accords with other decisions in this District requiring pre-deprivation hearings to noncitizens whom the government has previously authorized to remain outside of custody.  *See id.* at *5 (requiring pre-deprivation hearing before re-detaining noncitizen whom the government released on bond a decade ago); *Danierov*, 2025 WL 3653925, at *2–*3 (requiring pre-deprivation hearing before re-detaining citizen that the government released into the country over two decades ago).  In renewing her DACA status several times over the last decade, most recently in 2024, the government has continually determined that Petitioner should remain out of custody.  "Again, Petitioner is neither a danger nor a flight risk, has no criminal record, has been gainfully employed," and detaining her absent a change in circumstances "appears to serve no valid purpose."  *Hernandez-Parrilla v. Anda-Ybarra*, 2025 WL 3632769, at *6.  "In addition, pre- or post-detention hearings are relatively routine and do not impose a heavy burden on the government."  *Id.*

### IV. Injunction against removal from the U.S. and transfer out of the District of New Mexico.

Petitioner requests that the Court prohibit her removal from the United States and transfer outside of the District of New Mexico during the pendency of this action. Doc. 1 at 24. Respondents did not address this request in their Response and thus have acquiesced to it. *See Mulford v. Altria Group, Inc.*, 242 F.R.D. 615, 622 n.5 (D.N.M. 2007) ("Failure to respond to an argument is generally deemed an acquiescence."). Accordingly, I recommend that the Court order that Respondents are prohibited from transferring Petitioner outside of the District of New Mexico and from removing her from the United States during the pendency of this action. *See Hernandez-Parilla*, 2025 WL 3632769, at *7 (ordering same).

### V. Costs and attorneys' fees pursuant to the Equal Access to Justice Act.

Petitioner's final prayer for relief asks the Court to award her costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Doc. 1 at 24. The EAJA provides that

> a judgment for costs . . . but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.

28 U.S.C. § 2412(a)(1). The EAJA further provides that

> [e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

22

28 U.S.C. § 2412(d)(1)(A). The Tenth Circuit has held that the EAJA "unambiguously authorize[s] fees in habeas actions challenging immigration detention." *Daley v. Ceja*, 158 F.4th 1152, 1166 (10th Cir. 2025).

A fee award is required under the EAJA if "(1) plaintiff is a 'prevailing party'; (2) the position of the United States was not 'substantially justified'; and (3) there are no special circumstances that make an award of fees unjust." *Hackett v. Barnhart*, 475 F.3d 1166, 1172 (10th Cir. 2007) (quoting 28 U.S.C. § 2412(d)(1)(A)). The EAJA requires a prevailing plaintiff to, "within thirty days of final judgment in the action, submit to the court an application for fees and other expenses" that includes an allegation "that the position of the United States was not substantially justified." 28 U.S.C. § 2412(d)(1)(B). The Tenth Circuit has stated that "once an EAJA application is filed, the government is on notice . . . that it must justify both its position in any underlying administrative proceedings and its position in any subsequent district court litigation." *Hackett*, 475 F.3d at 1170.

The Court need not make a ruling as to EAJA fees at this point. Should the Court grant Petitioner relief, Petitioner may file an EAJA application alleging that the government's position was not substantially justified. *See id.* Once that application is filed, the government will have the opportunity to demonstrate that its position in both the underlying immigration case and this present district court litigation was substantially justified. *See id.*

## CONCLUSION

For the foregoing reasons, I recommend that the Court GRANT the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. 1). I recommend that the Court order Respondents to release Petitioner immediately, and to promptly file a status report with the Court confirming Petitioner's release. I further recommend that the Court prohibit Respondents from

re-detaining Petitioner without first holding a pre-deprivation bond hearing before an Immigration Judge at which the government bears the burden of proving by clear and convincing evidence that Petitioner is a flight risk or a danger to the community. Finally, I recommend that the Court prohibit Petitioner's transfer outside of the District of New Mexico and removal from the United States while this matter is still pending.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma***, 73 F.3d 1057, 1060 (10th Cir. 1996). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court.** *Id.* **In other words, if no objections are filed, no appellate review will be allowed.**

_____
LAURA FASHING
UNITED STATES MAGISTRATE JUDGE